■ NICHOLAS RODRIGUEZ, Respondent, v TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY, Appellant. (Action No. 1.) CATHERINE MOORE et al., Respondents, v TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY, Appellant, and NICHOLAS RODRIGUEZ et al., Respondents. (Action No. 2.) [716 NYS2d 24] —In two actions to recover damages for personal injuries, etc., which were consolidated for trial, the defendant Triborough Bridge and Tunnel Authority appeals from two interlocutory judgments of the Supreme Court, Kings County (Schmidt, J.), both entered April 28, 1999, which, upon a jury verdict on the issue of liability finding it 100% at fault in the happening of the accident, are in favor of the plaintiffs in, Action Nos. 1 and 2 and against it on the issue of liability.

Ordered that the interlocutory judgments are reversed, on the law, and a new trial on the issue of liability is granted, with costs to abide the event.

The plaintiff in Action No. 1, Nicholas Rodriguez, while driving on a bridge owned and operated by the defendant Triborough Bridge and Tunnel Authority (hereinafter the TBTA), lost control of his vehicle and went into the opposing lane of traffic, resulting in a multiple-vehicle collision. Rodriguez thereafter commenced Action No. 1 against the TBTA alleging that a proximate cause of the accident was unsafe metal grating on the bridge roadway. The TBTA alleged that a proximate cause of the accident was that Rodriguez was intoxicated. In Action No. 2, consolidated for purposes of trial, the plaintiffs Catherine Moore and John Moore, also involved in the accident, sought damages from, among others, Rodriguez and the TBTA. At trial, the TBTA offered a certified copy of Rodriguez's

hospital record, which set forth the result of a blood test indicating a blood alcohol level of .114. The court denied admission into evidence of that portion of the record which set forth the test result. Ultimately, the jury found the TBTA 100% at fault in the happening of the accident. We now reverse and order a new trial on the issue of liability.

The blood alcohol test result, as set forth in a certified hospital record, was admissible as prima facie evidence of the same pursuant to CPLR 4518 (c) (*see, Cleary v City of New York,* 234 AD2d 411; *Maxcy v County of Putnam,* 178 AD2d 729; *LaDuke v State Farm Ins. Co.,* 158 AD2d 137; *Tinao v City of New York,* 112 AD2d 363; *Campbell v Manhattan & Bronx Surface Tr. Operating Auth.,* 81 AD2d 529). To the extent that our decision in *Marigliano v City of New York* (196 AD2d 533) may be read to the contrary, it should not be followed.

We disagree with our dissenting colleague that the testimony of Dr. Lisa Dresner, the attending physician in the emergency room when Rodriguez was seen after the accident, warranted denial of the admission of the hospital record as it concerned the blood alcohol test, rather than only presenting a question as to the weight such evidence was to be accorded (*see, Cleary v City of New York, supra; Maxcy v County of Putnam, supra; Tinao v City of New York, supra;* CPLR 4518 [a]).

Dr. Dresner testified that the administration of blood tests, including one for alcohol content, was "routine procedure" for trauma patients, and was required "[f]or reasons of diagnosis and treatment" and to aid the anesthesiologist if surgery was needed. In 1993, when Rodriguez was seen, the relevant procedures were as follows: (1) upon entry to the emergency room, blood would be drawn "right away" by a physician, labeled, and sent by pneumatic tube to an in-house laboratory for testing, and (2) the test results would be faxed back to the emergency room, or could be retrieved by telephone, where a resident had the duty to collect the information and make the proper entries in the hospital record. This testimony supports a conclusion that the hospital record was properly certified and the test results were admissible (*see, People v Kennedy,* 68 NY2d 569; *Williams v Alexander,* 309 NY 283; *Wilson v Bodian,* 130 AD2d 221).

We disagree with our dissenting colleague that great significance may be attached to the fact that a laboratory slip concerning the subject blood alcohol test was not appended to Rodriguez's hospital record. Dr. Dresner explained that due to a patient's movement throughout the hospital for various tests,

it was not unusual in 1993 that such slips were not returned to the record. Further, and more significantly, Dr. Dresner, upon close questioning by the court, stated that the lack of the slip would not impeach the reliability of the blood alcohol entry, which she had co-signed, and that if major surgery was needed, she and the anesthesiologist would rely upon the entry without more.

Similarly, her comment that the general state of hospital records in 1993 was "chaos", when placed in context, did not impeach the reliability of Rodriguez's hospital record or the blood alcohol test. The statement was made during the following colloquy:

"THE COURT: When you say it was a problem, was it a problem that being there was no slips that the results being reported in the chart were not accurate to a hundred percent degree.

"DR. DRESNER: *Not at all*. The problem is, as this chart is, it was chaos. Nobody knew who—nobody knew who drew the blood. Nobody knew who wanted the blood drawn. When the results came back, there was no record that someone saw it, *and a lot of this didn't get billed properly * * ***

"COUNSEL: There was no problem in terms of somebody's blood getting under somebody elses [*sic*] name?

"DR. DRESNER: *That's not the problem that I'm referring to*" (emphasis supplied).

Finally, the second blood alcohol test referred to by the dissent, which indicated a normal blood alcohol content, resulted from a test conducted many hours after Rodriguez's morning admission. Thus, it did not impeach the prior blood alcohol test. In sum, the Supreme Court erred in denying admission of the test result, and the error requires a new trial on the issue of liability. In light of this conclusion, the remaining contentions of the TBTA need not be addressed. Ritter, J. P., Altman and Feuerstein, JJ., concur.

Luciano, J., dissents and votes to affirm the interlocutory judgments appealed from, with the following memorandum: I disagree with the majority that CPLR 4518 (c) permits the admission into evidence of a certified hospital record as prima facie evidence of the information contained therein, thus precluding the trial court from examining the completeness, reliability, relevancy, materiality, and competency of portions of a hospital record upon a party's objection. The Supreme Court herein, upon the objections of adverse parties Catherine and John Moore (hereinafter Moore) and Nicholas Rodriguez (hereinafter Rodriguez), after a lengthy hearing, denied the

motion of the defendant Triborough Bridge and Tunnel Authority (hereinafter the TBTA) to enter into evidence the handwritten notation "Etoh 114", indicating a blood alcohol level of .114, that was contained in a certified hospital record.

While CPLR 4518 (c) provides a basis for admitting reliable evidence contained in a certified hospital record, this exception to the hearsay rule is not intended to either restrict or limit the right of trial counsel to object thereto, or divest the trial court of its discretion to redact portions of a hospital record that, as in the case at bar, are patently incomplete, unreliable, irrelevant, immaterial, incompetent, or potentially prejudicial, notwithstanding that the record is certified. A court has the obligation to determine whether the probative quality of the evidence is outweighed by the prejudicial effect of the hospital record offered.

The Legislative history shows that CPLR 4518 (a), which sets forth the foundational elements for the admission of business records, was amplified by the Legislature to include CPLR 4518 (c) for remedial purposes. Pursuant to CPLR 4518 (a), a record is admissible as a business record upon a showing that (1) it was made in the regular course of business, (2) it was the regular course of the business to make such a record, (3) it was made by someone who had the obligation to make the record in the regular course of business and who had actual knowledge of the event recorded or had received the information from someone within the business who had actual knowledge and was under a business duty to report the event to the maker of the record, and (4) the record was made at the time the transaction or event occurred.

CPLR 4518 (c) provides that a hospital record that bears a certification setting forth the foundational requirements of CPLR 4518 (a) is admissible into evidence as prima facie evidence of the facts contained therein, without requiring the proponent to establish the foundational elements for the admission of business records through oral in-court testimony. While CPLR 4518 (c) dispenses with in-court foundational oral testimony required by CPLR 4518 (a), legislative history and case law indicate that the prima facie element of CPLR 4518 (c) is not one that must be accepted without question. In its 1958 report to the Legislature, the Advisory Committee on Practice and Procedure stated, " 'As used, the term [prima facie] means a presumption which shifts the burden of coming forward and not the burden of persuasion. It is rebutted when evidence contrary to the presumed fact sufficient to support a finding of its negative has been introduced' " (NY Advisory

Comm of Prac & Proc, Second Preliminary Report, NY Legis Doc No. 13, at 267, reprinted in Alexander, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C4518:9, at 119).

It should further be noted that the Court of Appeals has held that prima facie evidence is not a presumption which must be rebutted, but rather, an inference (*see, People v Mertz,* 68 NY2d 136, 148; *see also, Matter of Commissioner Social Servs. v Philip De G.,* 59 NY2d 137, 140). CPLR 4518 (c), therefore, does not lead to an assumption of fact to be weighed by the trier of the facts.

Moreover, the 1970 Legislative reports accompanying the proposed amendment to CPLR 4518 to add subsection (c), stated that the proposed amendment sought merely to prevent the "troublesome inconvenience" of proffering in-court foundational testimony (Eighth Report of Judicial Conference to Legislature, 1970 McKinney's Session Laws of NY, at 2796). In doing so, the Legislature continued to require the same standards of relevancy that governed admissibility under subdivision (a) (*see,* Eighth Report of Judicial Conference to Legislature, 1970 McKinney's Session Laws of NY, at 2796). The report stated, in relevant part:

"The proposed rule change would prevent such troublesome inconvenience by providing for the admissibility of the records specified in CPLR 2306 and 2307, as prima facie evidence of the facts contained in these records, upon proper certification or written authentication. *This amendment is a technical change with a remedial purpose, and, in the opinion of the Committee, not inconsistent with other evidentiary provisions of the CPLR.*

"*It is, of course, intended that the admissibility under this subdivision of the contents of the pertinent records would be governed by the same standards of relevancy which govern admissibility under subdivision (a)*" (*see,* Eighth Report of Judicial Conference to Legislature, 1970 McKinney's Session Laws of NY, at 2796 [emphasis supplied]).

Although the 1970 Legislature dispensed with the "inconvenience" of presenting foundational in-court testimony, it indicated no intention to eliminate the burden of going forward with sufficient foundational evidence to permit the admission of the reliable portions of a hospital record. CPLR 4518 (c) merely created a procedural method by which a hospital record may be received into evidence without inconvenient loss of time and expense to the proponent of the records, the keeper of the records, and the court.

Nonetheless, where the reliability and completeness of the hospital records or portions thereof are challenged, the records must be tested by the court to determine, as a threshold issue, completeness, reliability, relevancy, materiality, competency, and prejudice before presenting it to the jury. If, however, the inquiry as to the reliability of hospital record evidence began and ended with the acceptance of the entire record as prima facie evidence of the facts therein in the face of objections thereto, the trial court would be stripped of all power to redact incomplete, irrelevant, unreliable, immaterial, incompetent, or prejudicial material. This was never the legislative intent of CPLR 4518 (c). By keeping the determination of those matters of law within the discretion of the Trial Judge, one is assured that the trier of fact will be empowered with only complete, relevant, reliable, material, competent, and nonprejudicial facts.

In the instant case, while the hospital record appeared on its face to be adequate, as indicated by the certification of authenticity, raising an inference that the record was admissible, if one reads CPLR 4518 (c) as the Legislature intended, the proponent of the record, nonetheless, must sustain the burden of proving reliability in light of the objections of opposing counsel. In relying on the testimony of Dr. Dresner that the absence of the lab slip would not impeach the reliability of the blood alcohol entry, the majority impliedly acknowledges that a test for entry into evidence is reliability. It must not be forgotten that a hospital record is hearsay, not generally admissible for the truth of the matter therein, and must bear the indicia of reliability before it will be accepted in evidence as an exception to the hearsay rule. Whether evidence is incomplete, unreliable, irrelevant, immaterial, incompetent, or adversely prejudicial is purely a question of law for the trial court to decide.

It is ineluctable on the basis of the objections of Moore and Rodriguez that TBTA failed to sustain its burden of proving the reliability of the evidence that Rodriguez's blood alcohol level was .114. The only evidence relating to Rodriguez's intoxication consists of the sole handwritten notation "Etoh 114", which was scribbled by an unknown intern. It is undisputed by all parties that the hospital record did not contain any laboratory slips, faxed message, or any other documentation indicating who drew the blood, what time it was drawn, what tests were performed, and even whether it was Rodriguez's blood.

The testimony of Dr. Lisa Dresner, the attending physician

on duty when Rodriguez arrived at the emergency room, was insufficient to establish that the notation regarding his blood alcohol level was reliable. Dr. Dresner admitted that she had no independent recollection of the events recorded in the hospital record, and that she did not draw Rodriguez's blood upon his admission to the emergency room. Dr. Dresner testified, however, that a physician always drew the blood for testing from the patients. She stated that, as a general rule, when blood is drawn, it is sent to the laboratory on the hospital premises for analysis. Results in the form of a laboratory slip are sent from the laboratory to the emergency room. At times the results were faxed. At other times, a physician might call the laboratory to obtain test results orally which would then be handwritten into the patient's record to be used for the purpose of diagnosis and treatment. It is the responsibility of the intern on duty to collect the relevant information and ensure that it was appropriately entered in the patient's record.

Of great significance is the fact that Dr. Dresner acknowledged that no laboratory slips or faxed messages regarding Rodriguez's alleged .114 blood alcohol level were contained in the hospital record. Dr. Dresner testified that since Rodriguez was transferred to many different departments in the hospital for treatment, along with his chart, it was not unlikely that a laboratory slip did not "connect" to his chart. She further admitted that in 1993, only 50% of the hospital charts were complete, from the perspective of containing all of the laboratory slips for tests ordered. In response to a question as to whether Rodriguez's chart was complete, Dr. Dresner replied, "Obviously not * * * We have what the intern wrote, but we don't have those slips". This admission places the reliability of incomplete records in question. She further admitted that the chart failed to indicate who had drawn the blood and that she was not present when it was drawn. She, therefore, could not say what protocol was followed in drawing the blood. Additionally, there were no faxed slips corroborating the blood test results in the chart, and no indication who communicated the information regarding the blood alcohol levels from the laboratory to the emergency room.

Dr. Dresner further explained that there was no doctor's order requesting that blood be drawn in the emergency room, because it was assumed a doctor had drawn the blood. Of particular note is her testimony: "The problem is, as this chart is, it was chaos. Nobody knew who—nobody knew who drew the blood. Nobody knew who wanted the blood drawn. When the results came back, there was no record that someone saw it".

While there is what purports to be an intern's notation that Rodriguez's blood alcohol level was .114, the reliability of this notation is brought into question by a later blood test, for which there is a corresponding laboratory slip, indicating that his blood alcohol level was normal.

Upon the testimony of Dr. Dresner, it cannot be said that the majority's analysis that CPLR 4518 (c) mandates receipt into evidence those portions of a hospital record that have been shown to be so clearly incomplete and unreliable. Without the laboratory slips, faxed message, the testimony of the intern who made the notation, or the laboratory technician, there is simply no way to establish the time the blood was drawn, what tests were ordered for the blood, what tests were conducted, and whether the sample tested was even that of Rodriguez. Thus, Moore and Rodriguez would be deprived of essential pieces of evidence to challenge the reliability of the indication of Rodriguez's blood alcohol level. There is only the testimony of the emergency room attending physician, who admitted that she was not present when the blood was taken, and could only speculate concerning the circumstances under which Rodriguez's blood sample was collected and the results thereof recorded.

In light of the foregoing, my reliance on *Marigliano v City of New York* (196 AD2d 533, 535), is appropriate. The trial transcript therein indicates that when the defendant City attempted to admit the hospital record which contained the blood alcohol level test results of the third-party defendant, Edward Eichler, the plaintiff acknowledged that the record was certified but objected to the reliability of the evidence therein, on the basis that there was no foundation laid for the chain of custody and preservation of the blood sample taken. In hearsay evidence, reliability is an ever-present issue. Indeed, there was evidence that the blood tests, when taken, were listed as belonging to a "John Doe", and were only later identified as blood taken from Eichler. Counsel, therefore, argued that there should be, at the very least, testimony connecting the blood results to the person from whom the blood was taken. The trial court, however, ruled that evidence that Eichler's blood alcohol level test which indicated a reading of .0439% should be admitted in evidence. On appeal, this Court held that the trial court erred in admitting the evidence of Eichler's alcohol blood level absent any proof as to the test's authentication, satisfactory care in the collection of the same, its analysis, and the chain of custody thereof. In light of the similarity of circumstances with regard to the issue of intoxication between *Marigliano* and this case, it is submitted that *Marigliano* should be followed.

Since the case relied upon by this Court in *Marigliano* to support its position, *Matter of Nyack Hosp. v Government Empls. Ins. Co.* (139 AD2d 515) is not a case dealing with CPLR 4518 (c), the majority's reluctance to follow *Marigliano's* precedent is understandable. Significantly, however, the circumstances in *Marigliano* provide a sound and rational basis to support the dissent herein. It is noted that while *Nyack*, and the case it relies on, *Fafinski v Reliance Ins. Co.* (106 AD2d 88, *affd* 65 NY2d 990), do not address the application of CPLR 4518 (c), they, nonetheless, require the establishment of a proper foundation before the result of a blood alcohol test may be admitted on the issue of intoxication. Notably, this fundamental principle of law is applicable to cases involving either CPLR 4518 (c) or the Vehicle and Traffic Law.

The majority's reliance on a recent case from this Court, *Cleary v City of New York* (234 AD2d 411), to support their position is misplaced. A review of the records and briefs in that case reveals that the circumstances in *Cleary* are markedly different from those of the present case. In *Cleary*, the plaintiff, who was injured when his motorcycle crashed into the guardrails on the Gowanus Expressway, alleged that the City was negligent because it failed to fill potholes in the roadway, causing his motorcycle to go out of control. The court permitted the City to present evidence, *inter alia*, of the plaintiff's blood alcohol level which were the product of blood tests taken within four minutes of his arrival at the hospital. These facts were stipulated to by the parties. The redacted therapeutic drug report, which contained the blood alcohol level information and was a part of the certified hospital record, was entered into evidence without objection from any party. The City's expert then testified as to the significance of the blood alcohol levels, and was subjected to cross examination.

Of great significance in *Cleary* is that in his opening statement Cleary's counsel specifically told the jury that Cleary's blood had been taken at the hospital and that "he was found to have a high blood alcohol level, which meant that he had been drinking". He added that "[t]he evidence is going to be [that] the law is .10 the legal limit. It cannot exceed .10. Mr. Cleary had approximately .18 as shown in the hospital record." This was a practical waiver of any objection to the receipt of the results of the blood alcohol test.

It was not until Cleary appealed the jury verdict in favor of the City that he advanced the argument that there was no foundation laid for the blood test's authentication, the care in the collection of the sample, its analysis, or the chain of custody

thereof. The issue, thus, was not properly preserved for appellate review and, under those circumstances, this Court affirmed the Supreme Court's determination to admit the certified hospital record in its entirety.

The facts of *Cleary* are eminently distinguishable from the circumstances in the instant case. By contrast, Rodriguez's counsel made no admission in his opening statement that Rodriguez was legally intoxicated. He vigorously opposed the admission of such evidence, specifically because care in the collection of the sample and the chain of custody were lacking. In view of these facts, it would have been an abuse of discretion for the trial court to have received in evidence Rodriguez's blood alcohol level on the basis of the expediency provided for under CPLR 4518 (c), and permit the jury to consider such unreliable evidence. The court below recognized the prejudice which would probably occur and, therefore, had an obligation to exercise its discretion to conduct an inquiry, outside the presence of the jury, to determine the admissibility of Rodriguez's blood alcohol level. Thus, it is clear that the majority's reliance on *Cleary* is not supported by the facts, the law, logic, or analogy.

Further support for the position that a hospital record should be tested for reliability when objected to, in whole or part, is found in the statutory and case law of other States. These courts have held that even where hospital records are admissible pursuant to a statutory exception to the hearsay rule, the matter of the record's ultimate admissibility is left to the discretion of the trial court. The number of States employing the discretionary rule is certainly an indication that the certification requirement of the hospital records exception is not meant to be free from any challenge by the opposing party, or that a court is precluded from testing the reliability and trustworthiness of the record, simply because certification is present.

For example, Maryland Rule of Procedure 5-902 (a) (11) provides the foundational basis for admission of certified hospital records, with the additional proviso that "a record so certified is not self-authenticating under this subsection unless the proponent makes an intention to offer it known to the adverse party and makes it available for inspection sufficiently in advance of its offer in evidence to provide the adverse party with a fair opportunity to challenge it" (*Shpigel v White*, 357 Md 117, 741 A2d 1205, 1216; *see, Dietz v Moore*, 277 Md 1, 7, 351 A2d 428, 433; *see also, Owens-Illinois, Inc. v Armstrong*, 326 Md 107, 604 A2d 47, *cert denied* 506 US 871 [listing fac-

tors to be considered by the court in determining the trustworthiness of a business record]).

The Louisiana Rule § 13:3714 (*see,* Louisiana Rev Stat, tit 13, § 3714) provides that hospital records are admissible as prima facie proof of the contents without foundation evidence in addition to the certification. However, the Louisiana courts have qualified the general rule by stating that while the purpose is to save the proponent of the record the difficulty and expense of presenting foundation witnesses, the trial court retains the discretion to exclude records if they are unfairly prejudicial or, as indicated in Louisiana Code of Evidence article 403, if the probative value is substantially outweighed by the danger of unfair prejudice (*see, Mendoza v Mashburn,* 747 So 2d 1159 [La]; *see also, Judd v State of Louisiana, Dept. of Transp. & Dev.,* 663 So 2d 690, 694 [La]).

In Florida, the presumption of trustworthiness exists with regard to hospital records. The proponent of the record must, nevertheless, prove the foundational statutory predicate under the business record exception to the hearsay rule, and the determination to exclude the record is still within the sound discretion of the court (*see,* Fla Annot Stat §§ 90.403, 90.803 [6] [a]; *Love v Garcia,* 634 So 2d 158, 160 [Fla]).

Moreover, in West Virginia, even if the hospital record satisfies the foundational requirements of the business records exception to the hearsay rule (*see,* W Va Rules of Evidence, rule 803 [6]), the court has considerable discretion to exclude the record if it otherwise lacks trustworthiness (*see, Lacy v CSX Transp.,* 520 SE2d 418, 437 [W Va]).

It is submitted that CPLR 4518 (c), while allowing the admission into evidence of a certified hospital record without in-court foundational testimony as prima facie evidence of the information contained therein, does not preclude trial courts from exercising their fundamental right to evaluate the reliability, relevancy, materiality, competency, completeness, and prejudicial nature of a hospital record or any portion thereof upon the objection of a party. Accordingly, the Supreme Court did not err in conducting a hearing outside the presence of the jury as to the admissibility of that portion of the hospital record relating to Rodriguez's alcohol blood level, despite that it was certified pursuant to CPLR 4518 (c). Thus, I vote to affirm the Supreme Court.